1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ARLONZO JACKSON BANKS,                    No.  2:21-cv-00843 DAD DB

12                   Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   MATTHEY ATCHLEY,

15                   Respondent.

16

17        Petitioner Arlonzo Jackson Banks, a state prisoner, filed a petition for a writ of habeas

18   corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment of convictions entered in July

19   2014 in the Sacramento County Superior Court. Petitioner stands convicted of first degree murder

20   with a true allegation of personally using a firearm. In his habeas petition, petitioner raises the

21   following claims: (1) due process violation when the state court concluded that new evidence

22   from a recanting witness was insufficient to overturn petitioner's conviction and did not show

23   actual innocence; (2) the state court unreasonably applied federal law when it erroneously

24   concluded that the trial court's improper admission of character evidence did not prejudice

25   petitioner; (3) petitioner was denied his Sixth Amendment right to present a defense; (4) the

26   prosecutor committed prejudicial misconduct by misstating the law regarding self-defense; (5)

27   jury instructional errors; (6) denial of due process when trial court admitted evidence that Alvarez

28   possessed a firearm not used in the offense; and (7) cumulative errors.

For the reasons set forth below, it is recommended that the petition be denied.

## BACKGROUND

### I.    Facts Established at Trial

The California Court of Appeal for the Third Appellate District provided the following summary of the facts presented at trial:

> We review the trial record in the light most favorable to the prosecution and in support of the judgments. (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.) In any event, most of the salient details are not in material dispute.

> #### A. The Prosecution's Evidence

> ##### 1. The Heights and the Manors

> The Heights and the Manors are rival gangs in Sacramento. During the trial, the prosecution's gang expert, Detective Robert Quinn, explained that the Manors and the Heights have been embroiled in conflict for decades.

> As noted, Alexander, the victim, was a member of the Heights. Although Tanko denied any gang affiliation, there was substantial evidence that he was a member of the Manors. Tanko was friends with Banks, who was friends with Alvarez. Alvarez, in turn, was friends with Williams. During the trial, Alvarez, Banks and Williams all stipulated that they were members of Narf, a criminal street gang from Richmond. Based on a hypothetical with facts similar to the present case, Quinn opined that an alliance with an out-of-town gang would benefit a local gang by providing assistance in ongoing gang warfare and enhancing the gang's reputation as a force to be reckoned with in the community.

> ##### 2. Precipitating Events

> The events leading to the shooting were set in motion several years earlier, when Alexander's girlfriend, Brenda, and her friend, Brittanie, were threatened at gunpoint by member of the Manors. Brenda told Alexander about the incident. Several days later, police responded to a report of shots fired and contacted Alexander, who was in a car with a gun. As we shall discuss, there was no evidence that the presence of the gun in Alexander's car was connected to the earlier incident involving Brenda and Brittanie. (See Section II.B, *post*.)

> Nearly three years later, on March 4, 2011, M. Patterson and M. McZeek drove by Alexander's house playing loud music. Patterson and McZeek, who are both members of the Manors, were on their way to the barbershop where Patterson worked. Alexander was hosting a gathering to mourn a loved one and viewed Patterson and McZeek's actions as a sign of disrespect. Alexander responded to the perceived slight by running through the barbershop, firing shots in

the air. Alexander was arrested for the barbershop incident. Later, Patterson learned that Alexander blamed him for "snitching," a charge Patterson denied.

### 3. The Night of the Shooting

As noted, Alexander was shot in the early morning hours of March 12, 2011. The period preceding his death began with a gathering at a house on Nogales Street earlier that evening. The gathering was attended by C. Adams and D. Nolan, both members of the Manors. Adams and Nolan arrived together between 7:00 and 8:00 p.m. They were joined shortly thereafter by Tanko, who was accompanied by Alvarez and Banks, both of whom were visiting from Richmond.[1] The group talked and drank for a while, and then went outside. As they were standing outside, they saw a car approaching with no headlights, an indication that a drive by shooting might occur. Nolan ducked, prompting a discussion of how other members of the group would respond to a genuine threat of gun violence.

[N.1 Williams, who was babysitting, did not attend the gathering on Nogales Street.]

During this discussion, Nolan recalled, Banks said, "he not ducking, he got about a hundred rounds on him." Banks went on to say that he "got mine," which Nolan understood to mean that he had a gun. Banks also said that if he felt a situation was "getting ugly," he would "blam 'em." Alvarez said that he too would shoot, adding, "I ain't going to be the last person shooting, either. I ain't letting nobody shoot at me first." No guns were displayed during this conversation. Shortly thereafter, the group disbanded, with plans to reconvene at the American Spirit, a bar located in a strip mall on Northgate Boulevard.

A short time later, in another part of town, Brenda and Brittanie were driving in one of several cars that Brenda shared with Alexander. Brenda slowed for a yield right-of-way sign, and McZeek ran towards the car, brandishing a gun. Brenda and Brittanie accelerated through the intersection and got away, unharmed. McZeek fired several shots at the receding car, but none made contact.[2] Brittanie called Alexander and told him what had happened. Brenda, for her part, discussed the incident with Alexander by means of a series of text messages.

[N.2 McZeek was subsequently convicted of assault with a firearm on Brenda with a gang enhancement.]

In the meantime, Nolan and Adams had left the gathering on Nogales Street and were making their way to the American Spirit. En route to the bar, Nolan noticed Alexander behind him, driving aggressively and swerving from lane to lane. Alexander was accompanied by J. Jackson, a member of the Heights. Nolan turned into a Circle K and Alexander followed.

Nolan pulled up to a gas pump and Alexander pulled up behind him. Alexander approached Nolan and Adams. He was upset and angry,

stating that somebody had been shooting at his "baby mama." Alexander was also angry with Patterson, believing that Patterson had "told on him" for the barbershop incident. Nolan told Alexander that Patterson was at the American Spirit, across the street.[3] Alexander left the Circle K and drove across the street to the bar. There, Alexander met D. Scoggins, another member of the Heights. A surveillance video from the American Spirit recorded the meeting and shows "some kind of hand-to-hand transaction."

[N.3 During the trial, Nolan testified that he did not believe that Patterson was actually at the American Spirit at the time.]

Alexander drove back to the Circle K a short time later and asked to speak with Nolan. Nolan looked inside Alexander's car and saw a .22 or .25 caliber gun resting on Alexander's lap. Nolan, feeling disrespected, turned around and returned to his car.

Nolan watched Alexander leave the Circle K and turn left onto Northgate Boulevard, away from the American Spirit. Nolan and Adams then drove across the street to the bar, where they were soon joined by Tanko. Nolan told Tanko about the confrontation with Alexander. Williams, though a member of a Richmond gang, was living in Sacramento at the time of the offense. He was babysitting for much of the night and was not present for the gathering at Nogales Street, the confrontation at the Circle K, or the discussion at the American Spirit. However, Williams received a text message from Alvarez at 11:42 p.m., before the conversation in which Nolan told Tanko about the confrontation at the Circle K, stating, "Slap thirty on that thang HELLLLLO." During the trial, prosecution witnesses testified that a "thang" is a gun, and an extended magazine can hold twenty or thirty rounds of ammunition. Williams was relieved from his babysitting duties around midnight, and left the house with Alvarez between 12:15 and 12:30 a.m.

### 4. The Shooting

The American Spirit was located at the far end of a strip mall. A Long John Silver's restaurant was located near the opposite end of the strip mall. Alexander eventually returned to the strip mall, backing his car into a space near the entrance to the restaurant's drive thru lane, next to a friend's car. Alexander smoked marijuana in his friend's car for 10 to 15 minutes and chatted with another friend. During the trial, both testified that Alexander was "cool" and did not seem angry or upset.[4]

[N.4 However, there was also evidence that Alexander had been upset following the confrontation at the Circle K and had said things to indicate that he was planning to get a second gun.]

After smoking, Alexander got out of his friend's car and stood next to his own parked car. He spoke with yet another friend, A. Stevenson, who similarly testified that Alexander was calm and made no mention of the confrontation at the Circle K. During the trial, several witnesses, including Stevenson, placed Jackson, in the parking lot; however, Jackson denied having been there.

4

A white car drove by. During the trial, two witnesses testified that they saw the car drive by once. Another witness testified that she saw the car drive by four times. All testified that the car contained four people. Two witnesses testified that they recognized Tanko as the driver.[5]

[N.5 These witnesses also testified that Patterson was in the car, which does not appear to have been the case.]

A few minutes later, three men approached Alexander's car. During the trial, Stevenson described the three men as follows: a Hispanic man with a ponytail, an African American man with dreadlocks, and an African American man with short hair. These descriptions generally match Alvarez, Banks and Williams, respectively.[6] Alvarez had his hand inside his jacket, a gesture that caused Stevenson to feel "aware, alert."

[N.6 There were variations in witnesses' descriptions of the shooters; however, these discrepancies are not material to any issue currently before us.]

Alexander was sitting in the back seat of his car with the door open and his feet on the pavement. Stevenson heard one of the men ask a question about getting into the club. Stevenson turned to Alexander and saw an expression of fear flicker across his eyes. Frightened, Stevenson turned to leave, but was able to take only one or two steps before shots rang out. Stevenson did not see a gun in Alexander's hands and did not see which of the defendants fired first.

A security guard heard the shots and ran inside the American Spirit. After ensuring the safety of the bar's patrons, the guard ran back outside and saw "at least three people" circling Alexander's car and shooting.[7] During the trial, the guard testified that one of the shooters was standing on the driver's side of Alexander's car and appeared to be shooting into the car. According to the guard, the first shooter was within arm's reach of the car. A second shooter was standing "real close" to the car on the rear passenger's side. A third shooter was standing behind the second. The guard saw muzzle flash emanating from two of the three guns. He estimated that he heard close to 30 gunshots.

[N.7 During the investigation, the guard told police that he saw four people shooting into the car.]

When the shooting was over, Alexander lay dead in the backseat of his car. During the trial, one witness testified that she looked inside the car and saw a gun, "kind of in his lap, like, leaning." Stevenson testified that he looked inside the car but did not see a gun. Stevenson, however, in a statement to police, state that he saw Jackson look in the car after the shooting. Jackson left the scene before police arrived.

### 5. UC Davis Hospital

The shooting occurred at 12:43 a.m. Less than ten minutes later, at

12:51 a.m., a white car pulled up to UC Davis Medical Center. Three men, later identified as Alvarez, Banks and Tanko, got out. Moments later, Banks and Tanko carried Williams up the ramp towards the hospital. Williams was admitted for treatment of three gunshot wounds. Alvarez drove away.

Police contacted Banks and Tanko at the hospital. Banks and Tanko separately told officers that they had been on Mack Road, some ten miles away from the American Spirit, at the time of the shooting. Police later contacted Alvarez, who also claimed to have been on Mack Road.

### *6. Vacaville Outlets*

Tanko, Nolan, Patterson and McZeek went to the Vacaville Outlets in the days following the shooting. There, they met Alvarez and Banks.[8] During the course of the trip, Nolan overheard Alvarez, Banks and Tanko discussing the shooting.

[N.8 Williams was not present for the trip to the Vacaville Outlets and the jury was instructed that the evidence of the conversation between Alvarez, Banks and Tanko could not be used against him.]

According to Nolan, Banks said he walked up to Alexander with his gun out and asked, "[C]an you get in with these?" During the trial, Nolan testified that he understood Banks, through the use of the word "these," to be referring to guns. Nolan then testified that, in Banks' retelling, Alexander responded that he did not know but Banks could try. According to Nolan, Alvarez recalled that Jackson responded to Banks' question with a stutter, which Alvarez mimicked. Banks said that he started shooting first, but his gun jammed. Alvarez said that he started shooting when Banks' gun jammed. Banks asked the group to let him know if anyone found out who shot Williams, adding, "[I]t's no longer between the Manors and the Heights. It's between Richmond and the Heights."

During the trial, Detective Thomas Higgins testified that he interviewed Patterson in the course of his investigation. According to Detective Higgins, Patterson reported that he overheard a similar conversation between Alvarez, Banks and Tanko. Specifically, Patterson reported that Alvarez recalled walking up to Jackson and saying, " 'Can I get in with these?' " As Alvarez spoke, Patterson said, he motioned under his shirt, as if revealing a gun. According to Patterson by way of Detective Higgins, Alvarez said that Jackson stuttered, which Alvarez imitated. Alvarez then said that the shooting started, Alvarez fired his gun, and someone fired back. During the trial, Detective Higgins testified that he tried to determine whether Alvarez said anything to indicate who shot first, asking Patterson, "He said—but he said they pulled out the gun first?" Patterson responded affirmatively. According to Detective Higgins, it was clear from the context of the conversation that Patterson meant that Alvarez shot first.

According to Detective Higgins, Patterson also reported that Banks used the phrase, "knock somebody off the roof" (meaning, to shoot

someone), adding, "That's when I went over there and started shooting." Patterson reported that Banks said, "My little partner got shot" and "it got real." Patterson also said that Banks assured the group, "You all got nothing to worry about. They got nothing on us."

During the trial, Patterson admitted that he went to the Vacaville Outlets with Tanko, Nolan and McZeek, but denied almost everything else, stating that Detective Higgins "was just putting words in [his] mouth, saying stuff that never was even said."

### 7. Forensic Evidence

Forensic investigators found a trail of blood beginning near an entrance to the parking lot, turning onto a side street, and then heading towards Northgate Boulevard. DNA from the blood trail matched Williams' DNA profile. Investigators also found blood drops on the sidewalk of the side street that matched Alvarez's profile.

Investigators recovered multiple bullet fragments and cartridge casings from the area surrounding Alexander's car. Criminalist Philip Hess examined the casings and opined that they had been fired from four different guns: (1) a 9-millimeter Glock-type gun, (2) a 9-millimeter "non[-]Glock" gun, (3) a .45 caliber pistol, and (4) a .40 caliber Smith and Wesson.

During the trial, Hess testified that nine casings fired by a single Glock-type gun were recovered from the southeast side of the parking lot, in the area circumscribed by the driver's side of Alexander's car, on one side, and the strip mall, on the other side. Twenty casings fired by a single non-Glock gun were recovered from the area surrounding Alexander's car. Most of the non-Glock casings were found in the narrow passageway between the passenger's side of Alexander's car and an adjacent pickup truck. According to Hess, aperture shear marks found on the non-Glock casings are commonly associated with guns manufactured by Ruger. However, Hess allowed that a Beretta or Taurus could have left similar marks.

Five casings fired by a single .45 caliber pistol were recovered from the area behind Alexander's car, near another car parked in the drive thru lane. A single casing fired by a .40 caliber gun was found in the drive thru lane on the other side of the restaurant, near the pickup window.

Hess also examined bullets recovered from the crime scene and Alexander's body. During the trial, Hess explained that three bullets fired by a Glock-type gun were extracted from the southern wall of the restaurant. Thirteen bullets were recovered from Alexander's body during an autopsy (discussed at greater length below). Of these, 12 were 9-millimeter Luger caliber bullets, which would have been fired by a non-Glock gun. One was a .45 caliber bullet, which was recovered from the crotch area of Alexander's pants.

### 8. Autopsy and Gun Shot Residue

Dr. Stephany Fiore, a forensic pathologist, performed an autopsy on Alexander. During the trial, Dr. Fiore testified that Alexander suffered 21 gunshot wounds to the head, neck, chest, back, shoulder, arm, thighs and leg, three of which were lethal. Dr. Fiore also testified that she did not see any fire damage, soot, or stippling on Alexander, indicating that the guns were more than four feet away from him when fired. However, Dr. Fiore noted that Alexander was dressed in black, which would have made soot or stippling hard to see.

Criminalist Trevor Wilson tested samples taken from Alexander's hands for gunshot residue. During the trial, Wilson testified that he found gunshot residue on both sides of Alexander's right hand and the palm of his left hand. According to Wilson, the gunshot residue on Alexander's hands came from the muzzle of a gun, rather than the breach or discharge of a gun. However, Wilson could not exclude the possibility that Alexander had handled a gun before he died.

### 9. Search Warrant, Photograph and Facebook Records

Police executed a search warrant at the Rodeo apartment of Patricia Bost, Alvarez's mother, on March 31, 2011.[9] Police saw Alvarez run out of the apartment with a black gun in his hand. Alvarez, disobeying an order to stop, ran to the back fence and threw the gun to the other side. He then ran back inside. After securing the scene, police recovered a loaded black Glock .40-caliber handgun with an extended magazine from the other side of the fence. During the trial, the parties stipulated that the gun was not used in the shooting of Alexander.

[N.9 Bost is also Banks' girlfriend.]

Police searched Bost's phone and found photographs of Alvarez holding two handguns with extended magazines. The photographs were sent to Alvarez and his girlfriend at 6:10 p.m. on the evening of March 11, 2011, less than seven hours before the shooting. Criminalist Hess examined the photographs and opined that one of the guns in Alvarez's hands was a Glock or Springfield, and the other was a Ruger.

Police also searched Facebook records and found an exchange of messages between a user known as "Bam Rugerboi" (believed to be Alvarez) and another user known as "Spoony Love" (believed to be Williams). The messages, which were time stamped March 11, 2011, at approximately 7:00 p.m., discuss the users' plans for the evening, with Bam Rugerboi indicating that he planned to go out, and Spoony Love indicating that he planned to stay home with the kids. By March 13, 2011, Bam Rugerboi's Facebook account had been deleted.

### B. Defense Evidence

Banks called Detective Higgins as a witness for the defense. Detective Higgins testified that he interviewed another patron of the American Spirit, C. Goldsmith, in the course of his investigation. A video recording of the interview was played for the jury. During the

interview, Goldsmith told Higgins that he heard Alexander talking to Scoggins in the parking lot on the night of the shooting. According to Goldsmith, Alexander told Scoggins, " 'I'm about to go get the big thing, man. You know what I mean? Come back with the big thing.' " Goldsmith understood Alexander to mean that he was going to get a gun.

Goldsmith also told Detective Higgins that he spoke with Jackson on the morning after the shooting. According to Goldsmith, Jackson said that he was standing behind the car, the shooters approached, and Alexander " 'got in the car ... to get the thing ready.' " Jackson then said that he turned around, cocked his gun, and heard shots. Goldsmith was "almost positive" that Jackson said he shot back.

Finally, Goldsmith told Detective Higgins that his brother said that he removed an AK-47 from Alexander's lap immediately after the shooting, before police arrived. Detective Higgins and Goldsmith then called his brother, who denied knowing anything about it. No ammunition from an AK-47 was found at the scene.

### C. Closing Argument

During closing argument, the prosecutor theorized that the shooting was retaliation for the confrontation at the Circle K, in which Alexander disrespected Nolan and Adams by displaying a gun. Upon hearing of the incident, the prosecutor argued, defendants formulated a plan whereby out-of-towners, Alvarez, Banks and Williams, would approach Alexander while Tanko remained out of sight in the getaway car, thereby minimizing the chances that Alexander would sense danger and maximizing the chances that they would catch him unaware. Consistent with this plan, Alvarez, Banks and Williams approached Alexander, asked an unnecessary question about getting into the American Spirit (where Alvarez and Banks had been a short time before), and then opened fire before Alexander could answer.

The prosecutor postulated that Alvarez used the 9-millimeter non-Glock gun, Williams used the .45 caliber gun, and Banks used the .40 caliber gun, which jammed. The prosecutor acknowledged that Alexander probably had a gun that someone removed before police arrived. The prosecutor also acknowledged that Jackson probably returned fire, prompting Banks to run the length of the restaurant, towards the area where the .40 caliber shell casing was found. Nevertheless, the prosecutor urged the jury to reject defendants' anticipated self-defense argument, noting that Alexander was shot 21 times, and does not appear to have fired a single round. The prosecutor urged the jury to find Alvarez, Banks and Williams guilty as direct perpetrators, and Tanko guilty as an aider and abettor.

Defendants argued that they went to the American Spirit to meet women and have a good time, but unfortunately ran into Alexander, a volatile young man who was armed and spoiling for a fight. Alvarez, Banks and Williams argued that they did not know Alexander and had no reason to murder him. Tanko acknowledged that he knew Alexander, but insisted that he was not a member of the Manors, and would not have participated in any plan to shoot anyone,

given his peaceful nature and preference for nonviolence. Defendants noted that many of the testifying witnesses who were cooperating with police, were affiliated with the Heights or otherwise unworthy of belief. They urged the jury to conclude that the prosecution had failed to carry its burden of proving that they had not acted in self-defense.

In rebuttal, the prosecution argued against a finding of self-defense, pointing to evidence that Alvarez, Banks and Williams approached Alexander and displayed their guns to him. As we shall discuss, the prosecutor additionally argued that gang members arming themselves was, itself, relevant to the question of premeditation.

(ECF No. 10-18 at 3–12); People v. Banks, No. C0770034, 2018 WL 5023820, at *2–8 (Cal. Ct. App. Oct. 17, 2018).

## II.   Procedural Background

### A.   Judgment

A jury convicted petitioner of first degree murder, finding true the allegations that he personally used and discharged a firearm and not true the allegations that Banks personally discharged a firearm causing death and committed the crime for the benefit of a gang. (ECF No. 9-26 at 136–37.) The trial court imposed a prison term of 25 years to life for first degree murder and 20 year sentence for personal use of a firearm. (Id. at 160–62; ECF No. 9-4 at 54–56.)

## III.   State Appeal, State Habeas, and Federal Proceedings

Petitioner timely appealed his convictions, raising the following grounds: "(1) the trial court improperly admitted character evidence concerning Alvarez and Banks, (2) the trial court improperly limited the presentation of character evidence concerning Alexander, (3) the trial court improperly admitted evidence of a gun that was not used in the shooting of Alexander, (4) the prosecutor committed prosecutorial misconduct by misstating the law and misleading the jury during rebuttal argument, (5) the trial court erroneously refused to instruct the jury that there is no presumption of premeditation, deliberation or intent to kill when gang members arm themselves, and (6) all of the foregoing errors were cumulatively prejudicial." (ECF No. 10-18 at 2.) The state conceded the first issue but argued that the error was harmless. The state appellate court accepted the state's concession, determined that error was harmless, and rejected the remaining claims. (Id.) Petitioner also argued that he was entitled to remand to allow the trial court to consider

1  exercising its discretion under section 1385 to strike the firearm enhancement under recently

2  enacted section 12022.53(h), and the state court agreed, remanding the case for this limited

3  purpose. (Id. at 2–3; see also ECF No. 10-28.)

4       Petitioner sought review in the California Supreme Court. (ECF No. 10-22.) On January

5  23, 2019, the California Supreme Court summarily denied review. (ECF No. 10-24.) Petitioner

6  also sought habeas relief in state courts, and those courts denied the petitions. (ECF Nos. 10-25 to

7  10-27.)

8       The present petition was filed on May 5, 2021. (ECF No. 1.) Respondent filed an answer.

9  (ECF No. 11.) Petitioner filed a traverse. (ECF No. 16.)

10  **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

11       A court can entertain an application for a writ of habeas corpus by a person in custody

12  under a judgment of a state court on the ground that he is in custody in violation of the

13  Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not

14  available for an alleged error in the interpretation or application of state law. See Wilson v.

15  Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v.

16  California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing

17  alone is not cognizable in federal court on habeas.").

18       This court may not grant habeas corpus relief unless the adjudication of the claim:

19  
20      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

21  
22      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

23  28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established federal law"

24  consists of holdings of the United States Supreme Court at the time of the last reasoned state court

25  decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.

26  2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be

27  persuasive in determining what law is clearly established and whether a state court applied that

28  law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th

Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

A habeas corpus application can invoke § 2254(d)(1) in two ways. First, a state court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a holding of the Supreme Court or reaches a different result from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 786–87.

A petitioner may also challenge a state court's decision as being an unreasonable determination of facts under § 2254(d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir.

2012). Challenges under this clause fall into two categories; first, the state court's findings of fact "were not supported by substantial evidence in the state court record," or second, the "fact-finding process itself" was "deficient in some material way." Id.; see also Hurles v. Ryan, 752 F.3d 768, 790–91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient, and the state court opinion may not be entitled to deference). Under the "substantial evidence" category, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012) (quoting Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999–1001 (9th Cir. 2014)). The "fact-finding process" category, however, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present new evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

This court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

1  "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

2  a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

3  reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

4  banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim

5  has been presented to a state court and the state court has denied relief, it may be presumed that

6  the state court adjudicated the claim on the merits in the absence of any indication or state-law

7  procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be

8  overcome if "there is reason to think some other explanation for the state court's decision is more

9  likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court

10  decision rejects some of petitioner's claims but does not expressly address a federal claim, a

11  federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on

12  the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has

13  not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. §

14  2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d

15  at 860.

16  **ANALYSIS**

17  Petitioner asserts seven grounds for relief: (1) due process violation when state court

18  concluded that a recanting witness's declaration was insufficient to overturn petitioner's

19  conviction; (2) the state court unreasonably applied federal law when it erroneously concluded

20  that the trial court's improper admission of character evidence did not prejudice petitioner; (3)

21  petitioner was denied his Sixth Amendment right to present a defense; (4) the prosecutor

22  committed prejudicial misconduct by misstating the law regarding self-defense; (5) jury

23  instructional errors; (6) denial of due process when trial court admitted evidence that Alvarez

24  possessed a firearm not used in the offense; and (7) cumulative errors.

25  **I.   Claim One: New Evidence of Recanting Witness Testimony**

26  Petitioner claims that he was denied his Fourteenth Amendment right to due process when

27  the state court concluded that the new declaration from Deniro Nolan was insufficient to overturn

28  petitioner's conviction and did not prove actual innocence. (ECF No. 1 at 29–43; ECF No. 1-3

(Declaration of Deniro Nolan).)  Respondent argues that the claim is not cognizable because there is no actual innocence claim and habeas relief is not warranted for errors of state law. (ECF No. 11 at 10–11.)

### A.  State Court Opinion

Petitioner raised this claim in state habeas petitions. The Superior Court of California for the County of Sacramento quoted portions of the declaration as follows:

> I testified as a witness for the prosecution. In my testimony, I stated that I was with Mr. Banks at a house on Nogales on the night of the shooting, before going to the American Spirit Bar. I testified that I was involved in a verbal altercation with Rashad Alexander at a gas station on the night of the shooting, before I went to the American Spirit Bar. I testified that I was in the American Spirit Bar during the shooting, but that I did not see the shooting. I also testified that after the shooting, I gave Mr. Banks and Mr. Tanko a ride from Sacramento to Richmond. All of that testimony was true.

> However, I also testified that a few days after the shooting that I went with Mr. Tanko to the outlet mall in Vacaville. I testified that in the parking lot at the mall I heard Mr. Banks admit to committing the shooting. I testified that Mr. Banks said that he shot first and also said that his gun jammed. None of *this* testimony was true.

> I took Mr. Banks to Richmond after the shooting. I never saw Mr. Banks after I dropped him off. I also never spoke to Mr. Banks again.

(ECF No. 10-25 at 8.) The court determined that the "declaration meets the section 1473's definition of new evidence," but "[a]lthough material and credible submitted without delay, the declaration is not credible." (Id. at 10.) The court reasoned:

> The argument is Nolan lied at trial, but the declaration is to be believed. Undermining the truthfulness of Nolan's trial testimony, however, does not lead one to trust the declaration. Petitioner's effort to build up the declaration by tearing down Nolan's trial testimony is problematic because the declaration only recants a specific portion of his testimony, the meeting at the Vacaville outlets. In essence, Petitioner is arguing Nolan lied at points in the trial where Nolan maintains he testified truthfully. At best, this conflict casts doubt on the veracity of the testimony and the declaration….

(Id. at 11.) "Given the totality of the evidence against Petitioner, it cannot fairly be said that it is more likely than not the outcome of the trial would have been different if Nolan had testified in accordance with his declaration." (Id. at 14.) The state appellate court and supreme court summarily denied his state habeas petitions. (ECF No. 10-26 at 1; ECF No. 10-27 at 1.) Although

1   petitioner cited <u>Schlup v. Delo</u>, 513 U.S. 298 (1995) in all three state petitions, none of the state

2   courts' orders expressly addressed this issue. <u>See</u> <u>Richter</u>, 562 U.S. at 99 (federal courts may

3   apply a presumption that the state court adjudicated a federal claim on the merits even when the

4   decision is silent on that issue).

5       **B. Discussion**

6       Petitioner claims that he is entitled to habeas relief because the state court failed to

7   properly apply its own procedures in admitting his new evidence under California Penal Code

8   section 1473. (ECF No. 1 at 30–31.) It is axiomatic that a federal habeas court is limited to

9   reviewing whether a conviction violated federal law. Petitioner's claim is based on whether the

10  state court properly applied California law. Any errors of state law made by the state court do not

11  warrant federal habeas relief. <u>See</u> <u>Wilson</u>, 562 U.S. at 5 ("But it is only noncompliance with

12  *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal

13  courts."); <u>Estelle</u>, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to

14  reexamine state-court determinations on state-law questions.").

15      Petitioner also contends that given the new evidence, "a constitutional violation has

16  resulted in petitioner's conviction, as he is actually innocent of the crime for which he was

17  convicted." (ECF No. 1 at 29 (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). In <u>Schlup</u>, the

18  Supreme Court determined that to raise a claim of actual innocence to avoid a procedural bar,

19  "petitioner must show that it is more likely than not that no reasonable juror would have

20  convicted him in light of the new evidence." <u>Schlup</u>, 513 U.S. at 327. In this case, the state court

21  did not conclude that petitioner's claim was procedurally defaulted so the actual innocence

22  gateway exception does not apply.

23      To the extent petitioner is attempting to argue a freestanding actual innocence claim, this

24  argument does not succeed. The Supreme Court has not yet resolved whether a prisoner is entitled

25  to habeas relief for a freestanding actual innocence claim. <u>McQuiggin v. Perkins</u>, 569 U.S. 383,

26  392 (2013); <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on

27  newly discovered evidence have never been held to state a ground for federal habeas relief absent

28  an independent constitutional violation occurring in the underlying state criminal proceeding.");

1   <u>Gimenez v. Ochoa</u>, 821 F.3d 1136, 1143–45 (9th Cir. 2016) ("The Supreme Court has never

2   recognized 'actual innocence' as a constitutional error that would provide grounds for relief

3   without an independent constitutional violation."); <u>Jones v. Taylor</u>, 763 F.3d 1242, 1246 (9th Cir.

4   2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a

5   federal habeas corpus proceeding in the non-capital context, although we have assumed that such

6   a claim is viable.") But assuming this claim does exist, "[t]he standard for establishing a

7   freestanding claim of actual innocence is extraordinarily high and the showing for a successful

8   claim would have to be truly persuasive." <u>Jones</u>, 763 F.3d at 1246 (cleaned up) (citation omitted);

9   <u>see</u> <u>Carriger v. Stewart</u>, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). Petitioner "must go beyond

10  demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."

11  <u>Carriger</u>, 132 F.3d at 476 ("Requiring affirmative proof of innocence is appropriate, because

12  when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to

13  relief despite a constitutionally valid conviction.")

14          Petitioner has not affirmatively proved his innocence. Although Nolan's declaration

15  recants some of his trial testimony—particularly a conversation involving petitioner at the

16  Vacaville outlets several days after the shooting—it does not prove petitioner's innocence in the

17  shooting. Nolan did not recant his testimony that on the evening of the murder, petitioner said he

18  was not ducking if a drive-by shooting happens because "he got about a hundred rounds on him."

19  (ECF No. 9-18 at 205; <u>see also</u> <u>id.</u> at 206 (Nolan also testified that petitioner stated that if the

20  situation gets ugly, he will shoot).) Petitioner has not presented new evidence of an alibi or any

21  credible physical evidence that would preclude his guilt in the murder. As the state court noted,

22  the fact that Nolan recants only a portion of his trial testimony "does not lead one to trust the

23  declaration…At best, this conflict casts doubt on the veracity of the testimony and the

24  declaration." (ECF No. 10-25 at 11); <u>see also</u> <u>Carriger</u>, 132 F.3d at 477 ("Although [the

25  witness's] confession exonerating [petitioner] does constitute some evidence tending

26  affirmatively to show [petitioner's] innocence, we cannot completely ignore the contradictions in

27  [the witness's] stories and his history of lying."); <u>Prescott v. Santoro</u>, 53 F.4th 470, 482–83 (9th

28  Cir. 2022). This Court concludes that Nolan's declaration falls short of proving that petitioner is

17

probably innocent.  The state court's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law, or that such a finding was based on an unreasonable application of the facts. This Court recommends denying his claim of actual innocence.

## II.   Claim Two: Improper Admission of Character Evidence

Petitioner claims the state court unreasonably applied federal law when it erroneously concluded that the trial court's improper admission of character evidence did not prejudice petitioner. (ECF No. 1 at 43–51.) He asserts that "[b]ecause the improperly admitted character evidence suggested to the jury that petitioner had a propensity for violence and bad character, it can easily be concluded that it had a substantial and injurious effect on the jury's verdict." (Id. at 47.) Respondent argues that the state court's rejection of the prejudicial evidence claim was reasonable. (ECF No. 11 at 11.)

### A. State Court Opinion

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the California Court of Appeal considered and rejected the claim:

> #### A. Character Evidence Concerning Alvarez and Banks
>
> Banks argues the trial court erroneously admitted character evidence concerning Alvarez and himself, and erroneously denied his motion for a mistrial or curative instruction, in which Alvarez and Williams joined. Alvarez, Williams and Tanko join in Banks' argument. The People concede the evidentiary error, but argue the evidence was insignificant in the context of the entire trial. We accept the concession and conclude that the error was harmless.
>
> #### 1. Additional Background
>
> Nolan was a member of the Manors and a longtime friend of Tanko. On cross-examination of Nolan, Tanko's trial counsel elicited testimony that Tanko is a "pretty boy" and does not participate in "gang stuff" or "criminal activity stuff." On redirect, the prosecutor asked Nolan whether he was aware that Tanko sold drugs. Nolan clarified that Tanko does not participate in violent criminal activities. The prosecutor then proceeded, over defense objection, to elicit confirmation that Tanko was "different from these other guys," and "was a whole different kind of character" from Alvarez and Banks.
>
> Later, outside the presence of the jury, Banks renewed his objection to Nolan's testimony, arguing the prosecutor intentionally brought

improper character evidence in through the "back door." Alvarez and Williams joined in the objection. Banks asked the trial court to declare a mistrial or, in the alternative, strike Nolan's character testimony. Alvarez and Williams joined in the requests. The trial court denied both requests, stating, "I don't think the defense has been prejudiced, you or any of the other defendants have been prejudiced by the testimony, assuming some impropriety in the questioning."

Later still, Banks filed a formal motion for mistrial or, in the alternative, to strike the character testimony. Alvarez and Williams joined in the motion. The trial court denied the motion, ruling that the prosecutor's questioning did not elicit character evidence, and even if it did, defendants were not prejudiced.

### 2. Analysis

Evidence Code section 1101, subdivision (a) generally renders inadmissible "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) ... when offered to prove his or her conduct on a specified occasion." Defendants contend the prosecutor elicited improper character evidence by inviting Nolan to draw an unfavorable comparison between Tanko, on the one hand, and Alvarez and Banks, on the other. The People concede the issue, and we accept the concession.

Having accepted the People's concession of error, we next consider whether the error was prejudicial. Banks urges us to assess the effect of the error under the "harmless beyond a reasonable doubt" standard of review for errors of constitutional dimension. (*Chapman v. California* (1967) 386 U.S. 18, 24.) As a general rule, however, "violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91; accord, *People v. DeHoyos* (2013) 57 Cal.4th 79, 120.) We see no reason to depart from the general rule here. We therefore apply the "reasonable probability" standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*). (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"].) In so doing, we focus on the effect of error, if any, on Alvarez and Banks, as Williams claims the harm to him was derivative, and Tanko forfeited the issue by failing to object in the trial court.

We perceive no reasonable probability that Alvarez or Banks would have obtained a more favorable result had the challenged evidence been excluded. As the People observe, the improper character testimony was brief, amounting to two or three fragmentary lines in a trial transcript spanning more than 3800 pages. And these lines, though far from complimentary, were not particularly inflammatory. Although Nolan implied that Alvarez and Banks have a propensity for violence, the jury could have inferred as much from the

19

undisputed fact that they are members of Narf, a criminal street gang described as violent by the prosecution's Richmond gang expert. Nolan's testimony, which amounts to little more than an opinion that Tanko is "different," was not unduly prejudicial to Alvarez and Banks, particularly inasmuch as Tanko denied being in a gang.

By contrast, the concededly admissible evidence against Alvarez and Banks was overwhelming. Surveillance video and DNA evidence placed all four defendants in the parking lot on the night of the shooting. Several witnesses offered physical descriptions of the shooters that matched Alvarez and Banks. Given the abundance of evidence placing Alvarez and Banks at the scene, there was little question at trial as to whether or not they committed the acts alleged to constitute the offense. Rather, the focus was on their intent and whether they acted in self-defense. Here, too, the evidence against Alvarez and Banks was overwhelming.

Hours before the shooting, Banks boasted that he had a gun and "about a hundred rounds." Banks made clear that he would "blam 'em" if he felt the situation warranted. Alvarez, who was friends with Banks, said that he would also shoot, adding "I ain't going to be the last person shooting, either. I ain't letting nobody shoot at me first."

Defendants traveled to the American Spirit in a car rented by Alvarez's mother, Bost. They circled the parking lot as many as four times before parking. Moments later, Alvarez, Banks, and Williams approached Alexander's car. Someone asked a question about getting into the American Spirit, Jackson stuttered, and the shooting began.

The jury rejected defendants' assertion that they acted in self-defense, a finding amply supported by the record. Alexander was seated in the back seat of his car when Alvarez, Banks and Williams approached. Although Alexander may have had a gun in his car or on his person, there was no evidence that he was holding a gun, reaching for a gun, or otherwise posing a threat to Alvarez, Banks or Williams. By contrast, Alvarez approached Alexander with his hand in his jacket, as if concealing a gun; a gesture sufficiently menacing as to cause Stevenson to feel "aware, alert."

Alvarez and Banks each made admissions against interest that belie their assertion of self-defense. According to Nolan, Banks admitted that he approached Alexander with his gun out and asked, "[C]an you get in with these?" According to Patterson, Alvarez admitted that he approached Alexander and asked the same question—"Can I get in with these"—while motioning under his shirt, as if to reveal a gun. Although Nolan and Patterson differed in some of the particulars of the Vacaville Outlets conversation (and Patterson repudiated his statements to police when called as a witness), both averred that Alvarez and Banks approached Alexander and displayed guns. Neither reported anything to suggest that Alexander had a gun or displayed a gun. And while Alexander was shot 21 times at close range, there was no evidence that he returned fire.

The physical evidence supports Nolan's account of the Vacaville

20

Outlets admissions. According to Nolan, Banks told Tanko and others that he started shooting, but his gun jammed. A single shell casing from a .40 caliber weapon was found in the drive thru lane of the restaurant, near the area where Banks was believed to have run. That investigators only recovered one shell casing from a .40 caliber weapon was consistent with Banks' admission that his gun jammed after he started shooting.

According to Nolan, Alvarez said that he started shooting when Banks' gun jammed. Investigators recovered twenty 9-millimeter shell casings from the area surrounding Alexander's car, all fired from a single non-Glock firearm. These casings were consistent with a Ruger, a gun Alvarez evidently favored. Indeed, Alvarez had been photographed with two guns earlier that evening, one of which appears to have been a Ruger. And if there were any question that Alvarez liked Rugers, he also used the screen name "Bam Rugerboi" to post messages on Facebook—a practice he abruptly discontinued the day after the shooting. Of the 13 bullets recovered from Alexander's body, 12 were 9-millimeter Luger caliber bullets which would have been fired by a non-Glock gun, such as a Ruger.

Against this avalanche of evidence, the suggestion that Alvarez and Banks have violent characters because they are "different" from purportedly nonviolent Tanko appears to us to be a mere snowflake. As the trial court aptly noted, Nolan's character testimony was "not a big deal." We therefore conclude the error was harmless.

(ECF No. 10-18 at 13–16.)

**B. Discussion**

Petitioner argues that the state court erred in concluding that the admission of improper evidence did not prejudice the outcome of trial. He asserts that the prior bad act evidence was inadmissible under California Evidence Code section 1101. This issue is a matter of state law and is not cognizable on habeas review. See Estelle, 502 U.S. at 67–68; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see also Horton v. Mayle, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."); Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995). The erroneous admission of evidence is grounds for federal habeas corpus relief only if it made the state proceedings so fundamentally unfair as to violate due process. See Jammal v. Van de Kamp, 926 F.2d 918, 919–20 (9th Cir. 1991).

Assuming the claim is cognizable, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

21

1    corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

2    Court."  Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204–05 (9th Cir.

3    2021); Nava v. Diaz, No. 18-16165, 816 F. App'x 192, 193 (9th Cir. Aug. 12, 2020). Because the

4    Supreme Court has not clearly decided whether the admission of irrelevant or unduly prejudicial

5    evidence constitutes a due process violation sufficient to warrant habeas relief, Holley, 568 F.3d

6    at 1101, this Court cannot conclude that the state court's ruling was contrary to, or an

7    unreasonable application of, clearly established federal law. See generally, Wright v. Van Patten,

8    552 U.S. 120, 126 (2008) (per curiam); Jennings v. Runnels, 493 F. App'x 903, 906 (9th Cir.

9    Sept. 24, 2012); Bradford v. Paramo, No. 2:17-cv-05756 JAK JC, 2020 WL 7633915, at *6–7

10   (C.D. Cal. Nov. 12, 2020) (citing cases).

11           Petitioner's argument also fails on the merits. Admission of evidence violates due process

12   only if the jury could draw no permissible inferences from the evidence. Jammal, 926 F.2d at 920

13   ("Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'") After

14   independently reviewing the record, this Court concludes that it was not objectively unreasonable

15   for the state court to find that the evidence was not prejudicial. (ECF No. 9-19 at 12–14, 23–25;

16   ECF No. 9-21 at 213–15.) The challenged testimony is not of the kind that prevented a fair trial.

17   Jammal, 926 F.2d at 920. Here, the state court found that the error was harmless; "[a]lthough

18   Nolan implied that Alvarez and Banks have a propensity for violence, the jury could have

19   inferred as much from the undisputed fact that they are members of Narf, a criminal street gang

20   described as violent by the prosecution's Richmond gang expert." (ECF No. 10-18 at 15; ECF

21   No. 9-23 at 245–51; ECF No. 9-24 at 230–42, 252.) Federal courts allow gang evidence to prove

22   motive to commit the crime. (ECF No. 9-9 at 193); see, e.g., Estelle, 502 U.S. at 68–69; Noel v.

23   Lewis, 605 F. App'x 606, 609 (9th Cir. 2015); Nguyen v. Runnels, 127 F. App'x 926, 927–28

24   (9th Cir. 2005); Windham v. Merkle, 163 F.3d 1092, 1103–04 (9th Cir. 1998). The trial court

25   mitigated any chance of unfair prejudice by giving a limiting instruction that the jury "may not

26   conclude from this evidence that the defendant is a person of bad character or that he has a

27   disposition to commit crime." (ECF No. 9-9 at 193); Walters v. Maass, 45 F.3d 1355, 1357–58

28   (9th Cir. 1995); see also United States v. Takahashi, 205 F.3d 1161, 1165 (9th Cir. 2000); Garcia

22

1    v. Robertson, 784 F. App'x 992, 994 (9th Cir. 2019). Furthermore, the state court also determined

2    that there was overwhelming admissible evidence of petitioner's guilt and that he acted with

3    intent, not self-defense, regarding the murder. (ECF No. 10-18 at 15–16.) The state court's

4    decision was not contrary to, or an unreasonable application of, clearly established Supreme

5    Court authority, and this Court recommends denying habeas relief on this claim.

6    **III.    Claim Three: Sixth Amendment Right to Present Defense**

7            Petitioner claims that the state court violated clearly established law when it prevented

8    him from cross-examining Williams and Basabe about Alexander's retaliatory character and prior

9    possession of a firearm. (ECF No. 1 at 52–59.) In response, respondent disagrees arguing that

10   there is no Supreme Court precedent establishing that the Confrontation Clause entitles a criminal

11   defendant to introduce extrinsic evidence for impeachment purposes. (ECF No. 11 at 11.)

12       **A.  State Court Opinion**

13           Petitioner raised this claim in his direct appeal. In the last reasoned state court decision,

14   the California Court of Appeal considered and rejected the claim:

15                   Next, Banks argues the trial court abused its discretion and violated
                 his right to a fair trial by limiting his presentation of character
16               evidence concerning Alexander. Specifically, Banks argues the trial
                 court erred by limiting his cross-examination of Brenda and Brittanie
17               on the subject of Alexander's retaliatory character, and preventing
                 him from impeaching Brenda and Brittanie with the 2008 incident in
18               which Alexander was contacted by police while in possession of a
                 gun. Alvarez, Tanko and Williams join in Banks' argument. We find
19               no error.

20                   *1. Additional Background*

21                   Brenda was Alexander's girlfriend and a witness to two previous
                 incidents involving members of the Manors: (1) the incident in which
22               Adams pointed a gun at Brenda and Brittanie in May 2008, and (2)
                 the incident in which McZeek shot at Alexander's car, which was
23               driven by Brenda, on March 11, 2011. Brittanie was Brenda's friend,
                 and a witness to the same incidents.
24
                     During the trial, Brenda denied knowing that Alexander was a
25               member of the Heights and claimed she could not recall whether she
                 was concerned that Alexander might retaliate for the shooting by
26               McZeek. On cross-examination by Alvarez's counsel, Brenda was
                 asked what she meant when she urged Alexander to "leave it alone"
27               in a text message on the night of the shooting. Brenda responded that
                 she meant, "Don't do anything stupid." When asked whether she was
28               concerned that Alexander might shoot McZeek, Brenda responded,

                                              23

"I don't know if he would do that." On cross-examination by Williams' counsel, Brenda denied having been concerned that Alexander might shoot the person who shot at her.

During cross-examination of Brittanie, Alvarez's counsel asked whether she believed that Alexander was "a person who could take care of retaliation, if necessary." The prosecutor objected to the question as speculative, and the trial court sustained the objection.

After Brittanie's testimony, the parties made a record of a prior unreported sidebar conference in which Alvarez's counsel sought to impeach Brenda and Brittanie with a report that police contacted Alexander while he was in possession of a gun in May 2008. Alvarez's counsel argued:

"I sought and seek to re-open my request to impeach witnesses with the fact that in 2008, during the course of [Brenda's] relationship, Mr. Alexander, in fact, did obtain a gun immediately after the incident between her and [Adams] where [Adams] displayed a gun to [Brenda].

"Two days later, there is a report of shots fired. The police respond, locate Mr. Alexander in a car with a gun. At least arguably from the defense's point, it was in retaliation of—obtaining a gun in retaliation for [Adams'] actions towards [Brenda].

"And it would have impeached her credibility regarding her knowledge of Mr. Alexander with guns as well as Mr. Alexander retaliating with guns."

Banks, Williams and Tanko joined in the request. The prosecutor objected, arguing the evidence was too remote and tangential and would require an unnecessary expenditure of time on a collateral matter. The trial court denied the request under Evidence code section 352, noting, "There is going to be plenty of evidence in the trial, which associates the victim with guns ...."

Alexander's previous firearm possession came up again in cross-examination of Detective Quinn. Alvarez's counsel asked Detective Quinn about the incident, the prosecutor objected, and the trial court sustained the objection. Later, Alvarez's counsel renewed the request to admit the evidence that Alexander was contacted by police while in possession of a gun following the May 2008 incident. Banks' counsel joined in the request, which was denied. Later still, during further cross-examination of Detective Quinn, Alvarez's counsel raised the issue again, this time without objection. Detective Quinn confirmed that police contacted Alexander in a car while in possession of a gun two days after the incident in which Adams threatened Brenda and Brittanie with a gun.

*2. Analysis*

Evidence Code section 1103, subdivision (a) authorizes the defendant in a criminal case to offer evidence of the victim's character to prove his or her conduct at the time of the crime charged.

Consequently, in a prosecution for a homicide or assaultive crime where self-defense is raised, evidence of the violent character of the victim is admissible to show the victim was the aggressor. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446 (*Shoemaker* ).)

However, "a defendant's evidence of self-defense is subject to all the normal evidentiary rules," including Evidence Code section 352. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Evidence Code section 352 grants the trial court discretion to exclude evidence if the court determines its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "We review a challenge to a trial court's choice to admit or exclude evidence under [Evidence Code] section 352 for abuse of discretion." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.) A trial court's exercise of discretion under Evidence Code section 352 "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez, supra*, 20 Cal.4th at p. 9-10.)

Defendants argue the trial court abused its discretion by precluding them from questioning Brenda and Brittanie on the subject of Alexander's retaliatory character. However, the trial court allowed a number of questions regarding Alexander's character for retaliation, as Banks effectively concedes. In any event, the trial court could reasonably exclude the evidence under Evidence Code section 352 as cumulative and lacking probative value. (*Shoemaker, supra,* 135 Cal.App.3d at pp. 449-450.) As the People observe, other evidence established that Alexander had a propensity to retaliate, including the barbershop incident (which was precipitated by Patterson's ostensibly disrespectful driving) and the confrontation at the Circle K (which was precipitated by the shooting incident on March 11, 2011). On this record, the trial court could reasonably conclude that further testimony from Brenda and Brittanie concerning Alexander's propensity for retaliation was not sufficiently probative to overcome the likelihood that such testimony would necessitate an undue consumption of time. The trial court did not abuse its discretion in limiting the questioning of Brenda and Brittanie.

Nor was there any abuse of discretion in the trial court's decision to preclude defendants from impeaching Brenda with evidence that police contacted Alexander while in possession of a gun in May 2008. Banks argues that Alexander's possession of a gun in May 2008 was probative of his character for retaliation. However, as the People observe, there was no evidence connecting Alexander's possession of a gun with the near miss involving Brenda, other than defendants' speculation. Furthermore, there was ample evidence showing that Alexander retaliated with guns when he felt disrespected, much of which could have been used for impeachment purposes. On this record, the trial court could reasonably conclude that the "tangential" probative value of evidence showing that Alexander possessed a firearm in May 2008 was substantially

outweighed by the likelihood that such evidence would result in an undue consumption of time in an already lengthy trial. (Evid. Code, § 352.)

Banks contends the trial court's exclusion of the proffered evidence prevented him from presenting a defense. We are not persuaded. A defendant has a due process right to "present all relevant evidence of *significant* probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998-999.) However, the defendant "has no constitutional right 'to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352.' " (*Shoemaker, supra,* 135 Cal.App.3d at p. 450.) "Although the *complete* exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham, supra,* at p. 999, italics added.) Thus, a trial court's "application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right [to present a defense]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

The trial court's rulings did not prevent Banks (or any other defendant) from impeaching Brenda. Although Brenda denied knowing that Alexander was a member of the Heights, there was ample evidence of his gang membership, including photographs of Alexander wearing gang colors and throwing gang signs. Several such photographs were shown to Brenda on cross-examination, including one in which Brenda also appeared. And, though Brenda denied knowing that Alexander had a propensity to retaliate with guns, she admitted knowing that Alexander spent the night in jail for his part in the barbershop incident (in which he fired a gun in the air in retaliation for the perceived slight by Patterson) the week before he was killed. The exclusion of evidence that Alexander was contacted with a firearm in 2008 did not prevent Banks from vigorously impeaching Brenda or confronting her with evidence that Alexander had a propensity for retaliating with guns.

Nor did the trial court's ruling prevent Banks (or any other defendant) from presenting evidence from which the jury might have concluded that he acted in self-defense. Without again detailing the evidence, the jury heard testimony that Alexander was embroiled in a gang culture that demanded retaliation for disrespect, that he responded to a recent instance of perceived disrespect by firing a gun in a barbershop, that he was angry that McZeek fired shots at the car driven by Brenda, that he displayed a gun to Nolan mere hours before his death, that he spoke to others about getting another gun, and that he likely had a gun in his car or on his person when he was shot. Under the circumstances, we cannot conclude that the trial court's ruling prevented defendants from presenting their claim of self-defense.

(ECF No. 10-18 at 17–21.)

1

**B. Discussion**

2    The Constitution guarantees a criminal defendant the right to a meaningful opportunity to

3    present a defense. <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986). "The right of an accused in a

4    criminal trial to due process is, in essence, the right to a fair opportunity to defend against the

5    State's accusations." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973); <u>see also</u> <u>Webb v. Texas</u>,

6    409 U.S. 95, 98 (1972) (per curiam). This includes the right to cross-examination. <u>Pointer v.</u>

7    <u>Texas</u>, 380 U.S. 400, 404 (1965); <u>Alford v. United States</u>, 282 U.S. 687, 691–92 (1931); <u>Kirby v.</u>

8    <u>United States</u>, 174 U.S. 47, 55 (1899). But the right to present a defense is not absolute. <u>See</u> <u>Rock</u>

9    <u>v. Arkansas</u>, 483 U.S. 44, 55–56 (1987); <u>Alcala v. Woodford</u>, 334 F.3d 862, 877 (9th Cir. 2003);

10   <u>see also</u> <u>United States v. Mack</u>, 362 F.3d 597, 602 (9th Cir. 2004) ("Naturally, that right can be

11   limited and even relevant and reliable evidence can be excluded in proper circumstances.")

12   "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose

13   reasonable limits on such cross-examination based on concerns about, among other things,

14   harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

15   repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986).

16   The Supreme Court has not established a principle for evaluating a state court's

17   discretionary decision to exclude extrinsic impeachment evidence. <u>See, e.g.</u>, <u>Moses v. Payne</u>, 555

18   F.3d 742, 760 (9th Cir. 2009); <u>Hale v. Holland</u>, 655 F. App'x 533, 534 (9th Cir. 2016). "Only

19   rarely have we held that the right to present a complete defense was violated by the exclusion of

20   defense evidence under a state rule of evidence." <u>Nevada v. Jackson</u>, 569 U.S. 505, 509 (2013)

21   (per curiam); <u>Delaware v. Fennester</u>, 474 U.S. 15, 20 (1985) (per curiam) ("Generally speaking,

22   the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-

23   examination that is effective in whatever way, and to whatever extent, the defense might wish.")

24   The Supreme Court has stated that "[w]hile the Constitution thus prohibits the exclusion of

25   defense evidence under rules that serve no legitimate purpose or that are disproportionate to the

26   ends that they are asserted to promote, well-established rules of evidence permit trial judges to

27   exclude evidence if its probative value is outweighed by certain other factors such as unfair

28   prejudice, confusion of the issues, or potential to mislead the jury." <u>Holmes v. South Carolina</u>,

1    547 U.S. 319, 329 (2006).[1]

2            Here, the state court's decision to exclude extrinsic impeachment evidence of the victim's

3    retaliatory character or that the victim possessed a gun when he was contacted by police in 2008

4    was not contrary to, or an unreasonable application of, clearly established federal law. The state

5    court determined that the evidence was cumulative, lacking in probative value, and would take an

6    undue consumption of time. (ECF No. 10-18 at 19–20.)  This is in line with the Supreme Court's

7    warning that "[t]he admission of extrinsic evidence of specific instances of a witness' conduct to

8    impeach the witness' credibility may confuse the jury, unfairly embarrass the victim, surprise the

9    prosecution, and unduly prolong the trial." Jackson, 569 U.S. at 511. Despite petitioner's

10   unsupported claim to the contrary, the Supreme Court "has never held that the Confrontation

11   Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes."

12   Id. at 512. This Court concludes that the state court's decision was not contrary to clearly

13   established federal law. Nor was it objectively unreasonable. As the state court noted, "[t]he

14   exclusion of evidence that Alexander was contacted with a firearm in 2008 did not prevent Banks

15   from vigorously impeaching Brenda or confronting her with evidence that Alexander has a

16   propensity for retaliating with guns. (ECF No. 10-18 at 20; ECF No. 9-17 at 293–308; ECF No.

17   9-18 at 7–17.) The state court's ruling also did not prevent petitioner from providing evidence

18   that he acted in self-defense; there was evidence in the record that Alexander subscribed to gang

19   culture and demanded retaliation for disrespect, possessed firearms in the past, and likely had a

20   gun on him when he was shot. (ECF No. 10-18 at 20–21; ECF No. 9-17 at 293–308; ECF No. 9-

21   18 at 7–17.) Habeas relief is not warranted for this claim either.

22   ////

23   _____

24   [1] To determine whether a state court has erred in excluding evidence pursuant to a state
     evidentiary rule, the Ninth Circuit applies a balancing test. Alcala, 334 F.3d at 877 ("[i]n
25   weighing the importance of evidence offered by a defendant against the state's interest in
     exclusion, the court should consider the probative value of the evidence on the central issue; its
26   reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence
     on the issue or merely cumulative; and whether it constitutes a major part of the attempted
27   defense."); see also Drayden v. Wright, 232 F.3d 704, 711 (9th Cir. 2000). Because this balancing
     test is a creation of circuit law, it cannot be used to sharpen or refine clearly established federal
28   law. Marshall, 569 U.S. at 64; Moses, 555 F.3d at 759.

IV.   **Claim Four: Prosecutorial Misconduct**

Petitioner claims the state court erred in rejecting his argument that the prosecutor committed misconduct by misstating the law of self-defense, premeditation, and deliberation. (ECF No. 1 at 60–65.) In response, respondent argues that not every fairminded jurist could disagree with the state court's decision. (ECF No. 11 at 11–13.)

**C.  State Court Opinion**

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the California Court of Appeal considered and rejected the claim:

> Banks argues the prosecutor committed misconduct during rebuttal argument by suggesting that armed gang members do not have a right to self-defense, have already formed the intent to kill, and necessarily act with premeditation when they use their weapons. Alvarez, Williams, and Tanko join in Banks' argument. We find no prejudicial misconduct, and no abuse of discretion in the denial of Alvarez's related motion for a mistrial.

> ***1. Additional Background***

> During closing argument, the prosecutor urged the jury to find defendants guilty of first degree murder because they intended to kill Alexander and the murder was willful, deliberate and premeditated. Defendants argued that they went to the American Spirit to hang out and have fun but were forced to act in self-defense when they happened upon Alexander, an aggressive hothead who was armed and looking for trouble.

> In rebuttal, the prosecutor addressed the defense theory of self-defense, stating: "You can't approach someone with guns to start a confrontation and then claim self-defense. That's not how it works." The prosecutor continued, "The issue is whether or not these men were entitled to use self-defense when they shot Rashad Alexander, and the evidence shows they were not, because they approached him with their guns out and started this ordeal." The prosecutor displayed the text message from Alvarez to Williams saying, "Slap thirty on that thang," and then placed the extended magazine seized in the execution of the search warrant on Bost's apartment on the table, arguing, "If Mr. Williams is just watching those kids all night and all he wants to do is go have a drink with his buddies, why does he need to slap 30 on his thang?"

> The prosecutor then turned to the question of defendants' status as gang members, arguing, "Sure, gang members can go to bars. Gang members can go to barbecues. Gang members can go to house parties. They just do it with guns because you never know what might happen." The prosecutor then asked, rhetorically, "Do these gang members get to just go out to bars armed with guns and, when they walk up on someone with that gun out, claim self-defense when

there's a shooting? And the answer is no." Referring to the jury instructions, the prosecutor argued, "That's what that means. Self-defense does not apply." Elaborating on this theme, the prosecutor continued, "When gang members go and do their regular activities that everyone else does[,] only they do it armed because there might be a shooting, that is not only evidence that there's no self-defense; that's evidence of premeditation. They are walking out with the intent to kill. They just don't know who they might have to kill yet." The prosecutor continued, "And this idea of the arming being premeditation? They walk out of the house that way, going to a nightclub with guns because you don't know who you might have to shoot." The prosecutor then offered an analogy:

"I have a tree in my yard that drops leaves every fall, and I got to rake those leaves, but the rakes don't go on sale in the fall. They go on sale in the spring. So I buy my rake in the spring knowing exactly what I'm going to do in the fall when those leaves begin to come off the tree.

"I don't know which leaf it's going to be, and I don't know how many there are going to be, but I've got that rake sitting in my garage, and the moment that leaf falls from the tree, I'm going to go rake it.

"I've spent my time thinking about what I'm going to do. I've premeditated it. I've deliberated it. I've weighed the pros and cons. Now I just need the opportunity."

The prosecutor concluded his rebuttal argument shortly thereafter. Defendants did not object to any portion of the prosecutor's argument.

The jury retired to deliberate, and Alvarez moved for a mistrial on grounds of prosecutorial misconduct. Alvarez's counsel argued the prosecutor's rebuttal argument was improper in two ways. First, Alvarez's counsel argued the prosecutor committed misconduct by displaying the extended magazine seized during the execution of the search warrant on Bost's apartment, which was not used in the shooting. Second, she argued the prosecutor committed misconduct by stating, as she put it, "a gang member with a gun equals premeditation and deliberation, period, end of story." According to Alvarez's counsel, "he said two or three times in two or three different ways, 'If a gang member has a gun, that is premeditation and deliberation; that is murder.' " Banks, Williams and Tanko joined in the motion.

The prosecutor responded that he used the magazine demonstratively, and "did not argue that automatically gang members with guns equals premeditated murder." Rather, the prosecutor suggested, his argument "was in the context of this case and their possession of those guns." The trial court denied the mistrial motion, stating, "I understood [the prosecutor's] argument to be in the context in which he has just stated. I didn't find it to be objectionable and certainly not prejudicial."

The next morning, Alvarez's counsel requested that CALCRIM No.

30

521, which defines willful, deliberate and premeditated murder, be modified to address the prosecutor's purported misstatements of the law.[12] The prosecutor responded that the rebuttal argument was appropriate and did not misstate the law. The trial court rejected the request, stating:

[N.12 We discuss the proposed modification in greater detail *post*.]

"You could have chosen certain words better. I understood the argument to mean that gangsters who, in the course of their ordinary—otherwise ordinary lives, who arm themselves, have a general readiness to use their guns.

"I agree that it is not evidence of premeditation to use them against a particular person in a particular circumstance so [the prosecutor] could have chosen his words better, but I evaluate this in the context—

"Well, first of all, it is argument, not an instruction of law; and, secondly, I believe in the context with all the argument that was given in the case, it likely—most assuredly, I think—was understood in the context that I described, namely, that gangsters carrying guns have a readiness to use them.

"It is not quite the same thing as premeditation. I don't think the jury has been misled and so I am going to decline or reject your request."

### 2. Analysis

The Fourteenth Amendment to the United States Constitution is violated when a prosecutor's misconduct infects the trial with such unfairness as to deny due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009.) The misconduct must be significant enough to deny a fair trial. (*Ibid.*) Before a federal constitutional error can be deemed harmless, a reviewing court must declare it was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

Even if the prosecutor's misconduct does not result in a fundamentally unfair trial, California law is violated if the prosecutor uses deceptive or reprehensible methods in attempting to persuade the jury or the court. (*People v. Tully, supra,* 54 Cal.4th at pp. 1009-1010.) A violation of state law is cause for reversal only when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor not made the improper comment. (*People v. Milner* (1988) 45 Cal.3d 227, 245, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *Watson, supra,* 46 Cal.2d at p. 836.) In either case, only misconduct that results in prejudice requires reversal. (*People v. Fields* (1983) 35 Cal.3d 329, 363.)

### a. Forfeiture

"To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury."

(*People v. Brown* (2003) 31 Cal.4th 518, 553.) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice. [Citation.] Obviously, that purpose can be served only if defendant is required to, and does, raise any objection before the jury retires." (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

The People argue that defendants forfeited their claim of prosecutorial misconduct. We are inclined to agree; however, we need not reach the issue as we conclude the claim fails on the merits.

### b. No Prejudicial Misconduct

Banks argues the prosecutor committed misconduct by misstating the law in his rebuttal argument. Specifically, Banks argues the prosecutor's remarks allowed the jury to believe that armed gang members do not have a right to self-defense, and necessarily act with premeditation and intent to kill when they use their weapons. According to Banks, the prosecutor's closing remarks invited the jury to use defendants' gang status as character evidence, in violation of Evidence Code section 1101, subdivision (a) and his rights under the Fourteenth Amendment to the U.S. Constitution. We are not persuaded.

It is misconduct for a prosecutor to misstate the law during argument. (*People v. Otero* (2012) 210 Cal.App.4th 865, 870-871.) When a prosecutor's closing argument is challenged, the question " 'is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 244; see *People v. Clair* (1992) 2 Cal.4th 629, 663.) The prosecutor's statements are examined in the context of the entire argument and the instructions given to the jury. (See *People v. Morales* (2001) 25 Cal.4th 34, 44-46; *People v. Hill* (1998) 17 Cal.4th 800, 831-832 (*Hill* ), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) We also consider " ' "whether the prosecutor's comments were a fair response to defense counsel's remarks." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337 (*Seumanu* ); see *People v. Chatman* (2006) 38 Cal.4th 344, 386 ["Defendant's challenges to rebuttal must be evaluated in light of the defense argument to which it replied"].) We do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecutor's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144; *People v. Dykes* (2009) 46 Cal.4th 731, 771-772.)

With respect to the prosecutor's argument about self-defense, we perceive no reasonable likelihood the jury would have construed or applied the prosecutor's remarks in an objectionable fashion. Banks makes much of the prosecutor's comment that "Self-defense does not apply." Viewed in isolation, the comment could be construed as a misstatement of law, as gang members have the same right to defend themselves as anyone else. When the prosecutor's comment is considered in the context of his entire argument, however, it seems

32

to us more likely that he was referring to his earlier statement that gang members who approach one another with guns out cannot claim self-defense.[13] In that circumstance, "Self-defense does not apply." (See CALCRIM No. 3472.) We do " ' "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." ' " (*People v. Cortez* (2016) 63 Cal.4th 101, 131.) On the record before us, it is unlikely that jurors would have understood the prosecutor to mean that gang members do not have a right to self-defense.

[N.13 Banks argues the prosecutor misstated the evidence when he said that defendants approached Alexander with "guns out." However, Nolan testified that Banks said "he walked up to [Alexander] with his gun out" during the conversation at the Vacaville Outlets. Thus, the prosecutor's characterization of the evidence finds support in the record.]

The prosecutor's comments regarding premeditation and intent to kill present a somewhat closer question. Nevertheless, we think it unlikely that jurors would have understood the prosecutor to mean that armed gang members necessarily act with premeditation and intent to kill when they use their weapons. In our view, the prosecutor's comments are more reasonably interpreted to mean that gang members who arm themselves before leaving the house demonstrate prior planning activity, from which the jury may infer premeditation and deliberation. (See, e.g., *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [the fact that the defendant was carrying a loaded gun was evidence of prior planning activity, which was relevant to premeditation and deliberation]; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [the defendant's act of arming himself with a loaded weapon was evidence of planning consistent with a finding of premeditation and deliberation].) The same goes for the rake analogy, which was clearly intended to convey that the act of carrying a loaded gun demonstrates prior planning activity. The prosecutor's argument, viewed in this light, does not amount to a misstatement of the law. (*Villegas, supra,* at p. 1224.) Again, we do not lightly infer that the jury construed the prosecutor's comments as a misstatement of law.

But even assuming arguendo that the prosecutor misstated the law, we would find no prejudicial misconduct. The jury was properly instructed on first and second degree murder, self-defense and the limited use of gang evidence. (CALCRIM Nos. 500, 505, 521, 570, 3471, 3472, 3474, 1403.) Jurors were also instructed that they were to follow the trial court's instructions on the law and ignore any contrary argument by counsel. (CALCRIM No. 200.) Having been so instructed, the jury would have been unlikely to construe the prosecutor's argument in an objectionable fashion. "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband* (1996) 13 Cal.4th 622, 717.) We so conclude here. We therefore reject

1    defendants' claim of prosecutorial misconduct.

2    ### 3. No Abuse of Discretion in Denying Motion for Mistrial

3    Banks contends the trial court abused its discretion in denying
     Alvarez's motion for a mistrial, in which he joined. Alvarez,
4    Williams and Tanko join in the argument. The denial of a motion for
     a mistrial based on prosecutorial misconduct is reviewed for an abuse
5    of discretion. (See *People v. Williams, supra,* 16 Cal.4th at p. 190.)
     Having concluded that the prosecutor's argument did not amount to
6    prejudicial misconduct, we likewise conclude that the trial court did
     not abuse its discretion in denying the motion for a mistrial.

7

8    (ECF No. 10-18 at 24–30.)

9        **D. Discussion**

10           In reviewing the prosecutor's alleged misconduct, "[t]he relevant question is whether the

11   prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a

12   denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (Donnelly v.

13   DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker v. Matthews, 567 U.S. 37, 45 (2012)

14   (per curiam). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even

15   universally condemned.'" Darden, 477 U.S. at 181 (citation omitted). In making its

16   determination, the court should consider the prosecutor's comments in the context of the entire

17   trial record. Hein v. Sullivan, 601 F.3d 897, 912–13 (9th Cir. 2010). "[T]he *Darden* standard is a

18   very general one," and courts, therefore, have "'more leeway . . . in reaching outcomes in case-

19   by-case determinations.'" Parker, 567 U.S. at 48 (quoting Alvarado, 541 U.S. at 664). Even if

20   there was prosecutorial misconduct, habeas relief is only warranted if petitioner can establish that

21   the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"

22   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see also Parle v. Runnels,

23   387 F.3d 1030, 1044 (9th Cir. 2004).

24           After reviewing the record, this Court concludes that it was not objectively unreasonable

25   for the state court to decide that the prosecutor's closing arguments regarding self-defense,

26   premeditation, and intent to kill were not prejudicial. Petitioner raises two arguments. First, he

27   contends that the prosecutor misstated the law when he argued that self-defense does not apply to

28   petitioner, an armed gang member. (ECF No. 1 at 64; ECF No. 9-26 at 61–64.) The state court

34

1    noted that "[v]iewed in isolation, the comment could be construed as a misstatement of law, as

2    gang members do have the same right to defend themselves as anyone else." (ECF No. 10-18 at

3    28.) However, when viewed in the context of the entire record, the state court reasoned that it was

4    likely that the jury interpreted his argument to mean that "gang members who approach one

5    another with guns out cannot claim self-defense" rather than gang members never having a right

6    to self-defense. (Id. at 29.) Second, petitioner argues that the prosecutor erred when he argued that

7    armed gang members necessarily act with premeditation and intent to kill when they use their

8    weapons. (ECF  No. 1 at 64; ECF No. 9-26 at 61–64.) The state court reasoned "it unlikely that

9    jurors would have understood the prosecutor to mean that armed gang members necessarily act

10   with premeditation and intent to kill when they use their weapons. In our view, the prosecutor's

11   comments are more reasonably interpreted to mean that gang members who arm themselves

12   before leaving the house demonstrate prior planning activity, from which the jury may infer

13   premeditation and deliberation."  (ECF No. 10-18 at 29.)

14          Closing arguments are "seldom carefully constructed in toto before the event;

15   improvisation frequently results in syntax left imperfect and meaning less than crystal clear."

16   Donnelly, 416 U.S. at 646–47. While this "in no way justif[ies] prosecutorial misconduct, [it]

17   do[es] suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark

18   to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw

19   that meaning from the plethora of less damaging interpretations." Id. at 647. "Prosecutors and

20   defense lawyers are given 'wide latitude' in closing arguments." United States v. Wilkes, 662

21   F.3d 524, 538 (9th Cir. 2011). The prosecutor's challenged remarks in this case fall within that

22   wide latitude. In closing, the prosecutor also clarified that carrying a gun is evidence that they

23   "are walking out with the intent to kill." (ECF No. 9-26 at 62-63; see also ECF No. 9-25 at 172–

24   72 (prosecutor arguing that "they just happen to run into a guy who's got a feud with their

25   buddy's gang. That's not a coincidence. It's not a coincidence that Shaddie is dead 35 minutes

26   after that incident. That's a murder.") Even if the prosecutor erred in making the challenged

27   remarks, there was no prejudice. As the state court noted, the jury was properly instructed on the

28   charges, and that "[y]ou must follow the law as I explain it to you, even if you disagree with it. If

1  you believe that the attorneys' comments on the law conflict with my instructions, you must

2  follow my instructions." (ECF No. 9-9 at 174.) Jurors are presumed to follow the jury

3  instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Petitioner has not provided any

4  evidence to rebut that presumption. As a result, this Court concludes that the state court's

5  rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly

6  established federal law, or that such a finding was based on an unreasonable application of the

7  facts.  Habeas relief is not warranted for this claim.

8  **V.      Claim Five: Failure to Offer Curative Instructions**

9          Petitioner claims the trial court violated his due process rights by failing (1) to offer a

10  curative jury instruction for Nolan's testimony on petitioner's character and (2) to modify

11  CALCRIM No. 521 to correct the prosecutor's misstatements of the law concerning

12  premeditation and deliberation. (ECF No. 1 at 66–69.) As the first argument, respondent briefly

13  argues that there is no Supreme Court case that has clearly held that the Constitution requires

14  instructions to bar consideration of such evidence after its admission. (ECF No. 11 at 11.) As to

15  the second, respondent contends that not every fairminded jurist would agree with petitioner's

16  argument and whether the state court properly interpreted state law is not cognizable on federal

17  habeas review. (Id. at 12–13.)

18  **E.  State Court Opinion**

19          The state court considered these claims on direct appeal and rejected them. Regarding his

20  first claim, the failure to provide a curative instruction regarding character evidence,

21
22          We likewise conclude that the trial court acted within its discretion
        in denying Banks' motion for a mistrial or curative instruction. A
        motion for mistrial should be granted only if the trial court, " ' "is

23      apprised of prejudice that it judges incurable by admonition or
        instruction. [Citation.] Whether a particular incident is incurably
        prejudicial is by its nature a speculative matter, and the trial court is

24      vested with considerable discretion in ruling on mistrial motions." ' "
        " (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on another

25      point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In other
        words, a mistrial is to be granted only when the party's chances of

26      receiving a fair trial have been irreparably damaged. (*People v.
        Bolden* (2002) 29 Cal.4th 515, 555.)

27
        Trial court rulings on the admission and exclusion of evidence,
28      including motions to strike testimony, are similarly reviewed for

36

abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128, 130.) We will not disturb such rulings on appeal unless the appellant shows the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Here, the trial court reasonably concluded that Nolan's character testimony did not irreparably damage any defendant's chances of receiving a fair trial, and was not so prejudicial as to require an admonition or curative instruction. (*People v. Cox, supra,* 30 Cal.4th at 953; *Watson, supra,* 46 Cal.2d at p. 836.) The trial court did not abuse its discretion in denying the motion.

(ECF No. 10-18 at 16–17.)

The state court also rejected petitioner's second claim that the trial court failed to modify CALCRIM No. 521 to correct the prosecutor's misstatements.

Next, Alvarez argues the trial court prejudicially erred in denying his request to modify CALCRIM No. 521 (First Degree Murder). Banks, Williams and Tanko join in the argument. We conclude, as the trial court did, that no such instruction was necessary.

### 1. Additional Background

The jury was instructed with CALCRIM No. 521.[14] Following jury instructions and closing arguments, Alvarez sought to modify CALCRIM No. 521 by adding the following: "There is no presumption that the defendants acted with premeditation and deliberation because they were gang members who were armed when they encountered Mr. Alexander." Banks, Williams and Tanko joined in the request. The trial court rejected the proposed modification, stating: "I don't believe modifying the jury instruction as you have requested ... is necessary or appropriate."

[N.14 CALCRIM No. 521 provides as follows:

"The defendant is guilty of first degree murder if the People have proved that (he/she) acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if (he/she) intended to kill. The defendant acted *deliberately* if (he/she) carefully weighed the consideration for and against (his/her) choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if (he/she) decided to kill before completing the act[s] that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rationally, impulsively, or without careful consideration is not deliberate and premeditated. On the other

hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"[¶] ... [¶]

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder, and the murder is second degree murder."]

*2. Analysis*

Picking up where Banks left off, Alvarez argues the prosecutor's rebuttal argument raised an improper permissive inference that armed gang members necessarily act with deliberation and intent to kill when they use their weapons. According to Alvarez, the proposed modification would have cured the prosecutor's purported misconduct by ensuring that the jury was properly instructed on the elements of first degree murder. We are not persuaded.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) While a trial court need not go beyond these general instructions in the absence of a request, a defendant is entitled to an instruction that pinpoints his theory of the case, if he or she so requests. (*People v. Gurule* (2002) 28 Cal.4th 557, 660.)

The trial court may properly refuse an instruction highlighting a defense theory if it is "duplicative or potentially confusing." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1276.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; see e.g., *People v. Gonzales, supra*, at p. 1276 [trial court did not err in refusing to instruct jury that " 'a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder' " where topic was covered by standard aiding and abetting and child endangerment instruction and "giving two different instructions on the same topics would risk confusing the jury"].) Put another way, "[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) The failure to give an instruction on even an essential issue "may be cured if the essential material is covered by other correct instructions properly given." (*Ibid.*)

Alvarez argues the proposed modification was needed to counteract

38

the prosecutor's improper argument and ensure that the jury was properly instructed on the elements of first degree murder. However, the jury was already properly instructed on first degree murder, as Alvarez implicitly concedes. The jury was also instructed with CALCRIM No. 1403, which limits the use of gang evidence, and expressly states: "You may not conclude from this evidence the defendant is a person of bad character or that (he/she) has a disposition to commit crime." (CALCRIM No. 1403.) Neither Alvarez nor any other defendant suggests that any of these pattern jury instructions were defective or otherwise inadequate to the task of instructing the jury on the elements of first degree murder or the appropriate use of gang evidence. As previously discussed, jurors were also instructed to follow the trial court's instructions and disregard any attorney comments that were inconsistent with the instructions. We presume the jury understood and correlated the trial court's instructions, which adequately informed the jury that first degree murder requires proof of willfulness, deliberation and premeditation.[15] The prosecutor's comments did not necessitate any modification to the standard instructions, and the trial court did not err in denying the request. (*People v. Canizalez, supra,* 197 Cal.App.4th at p. 857.)

[N.15 That the jury understood and applied the instructions is clear from the fact that Williams, an armed gang member, was convicted of second degree murder, rather than first degree murder.]

(ECF No. 10-18 at 30–32.)

### F. Discussion

Federal habeas relief is only available if "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The instruction cannot merely be "undesirable, erroneous, or even 'universally condemned.'" Donnelly, 416 U.S. at 643. It must violate a constitutional right. Id. The jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). The Supreme Court has cautioned that there are few infractions that violate fundamental fairness. Id. at 72-73; see, e.g., Waddington v. Sarausad, 555 U.S. 179, 191–92 (2009); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam) ("Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation").

Petitioner's burden is "especially heavy" because he does not claim that the instructions were erroneous. Rather, he asserts that the trial court should have offered curative instructions

1  regarding improperly admitted character evidence and prosecutorial misstatements regarding

2  premeditation and deliberation. The constitutional significance of an omitted instruction must be

3  evaluated "by comparison with the instructions that were given," and an omitted or incomplete

4  instruction "is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe,

5  431 U.S. 145, 155-56 (1977).

6      In the context of all the jury instructions, this Court finds that the state court's denial of

7  petitioner's instructional error claims was not unreasonable. As to the first claim, a fairminded

8  jurist could agree with the state court's determination that "the trial court reasonably concluded

9  that Nolan's character testimony did not irreparably damage any defendant's chances of receiving

10  a fair trial, and was not so prejudicial as to require an admonition or curative instruction." (ECF

11  No. 10-18 at 17.) Jurors are presumed to follow the jury instructions. Weeks v. Angelone, 528

12  U.S. 225, 234 (2000). Petitioner has not provided any evidence to rebut that presumption.

13  Petitioner claims the evidence was highly prejudicial because "[w]here the jury was tasked with

14  deciding whether petitioner acted in self-defense, any evidence assaulting petitioner's good

15  character would have had a deleterious effect on the jury's verdict." (ECF No. 1 at 68.) This

16  Court disagrees; the trial court mitigated the risk of prejudice by instructing the jury that "[y]ou

17  may not conclude from this [gang] evidence that the defendant is a person of bad character of that

18  he has a disposition to commit crime." (ECF No. 9-9 at 193.) To the extent petitioner claims that

19  the trial court was obligated to give a curative instruction under state law, any errors of state law

20  made by the state court do not warrant federal habeas relief. See Wilson, 562 U.S. at 5; Estelle,

21  502 U.S. at 67–68.

22      As to the second claim, the state court reasonably concluded that "[w]e presume the jury

23  understood and correlated the trial court's instructions, which adequately informed the jury that

24  first degree murder requires proof of willfulness, deliberation and premeditation. The prosecutor's

25  comments did not necessitate any modification to the standard instructions, and the trial court did

26  not err in denying the request." (Id. at 32; see also ECF No. 9-9 at 188 ("A defendant is guilty of

27  first degree murder if the People have proved that he acted willfully, deliberately, and with

28  premeditation.")) Despite petitioner's argument to the contrary, the jury instructions instructed the

jury that all elements of an offense must be proven by the state beyond a reasonable doubt. (ECF No. 9-9 at 175–76; see also id. at 188 ("The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder.")) Petitioner is not entitled to habeas relief on this claim.

## VI.   Claim Six: Admission of Firearm not Related to Offense

Next, petitioner contends that the trial court erroneously admitted evidence that co-defendant Alvarez possessed a firearm (that was not used in the offense) when he was arrested, undercutting his self-defense claim and depriving him of due process. (ECF No. 1 at 69–73.) Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 11 at 11.)

### G. State Court Opinion

In the last reasoned state court decision, the state court considered and denied the claim:

> Next, Alvarez argues the trial court erred in admitting evidence of yet another gun—a Glock—that was not used in the shooting of Alexander. Banks joins in the argument. Williams and Tanko also join in the argument, but failed to object in the trial court, thereby forfeiting the issue. We find no error, but even assuming the trial court erred, we would find the error to be harmless.
>
> ### 1. Additional Background
>
> As noted, police executed a search warrant on the apartment of Alvarez's mother, Patricia Bost, in the weeks following the shooting. An officer saw Alvarez run out of the apartment, throw something over the back fence, and then run back inside. Police later recovered a loaded, Glock .40-caliber handgun with an extended magazine from the other side of the fence.
>
> Criminalist Hess examined the photographs recovered from Bost's phone, which showed Alvarez holding two guns with extended magazines. Hess opined that one of the guns shown in the photographs was the Glock recovered from the other side of the back fence. Hess opined that the other gun, which was never recovered, was probably a Ruger. The parties agree that the Glock was not involved in the shooting of Alexander.
>
> During the trial, the prosecution sought to introduce evidence of the Glock, arguing that the gun was relevant to show Alvarez's membership in a gang. When Alvarez offered to stipulate that he was a member of Narf, the prosecutor argued that the Glock was still necessary to reinforce the gang expert's opinion, but conceded that

41

the gun was not relevant to any other issue. The trial court ruled that the gun was inadmissible in light of the contemplated stipulation. However, the trial court left open the possibility of revisiting the issue at a later date, after the stipulation was committed to writing.

Later, Hess testified about the photographs of Alvarez holding two guns. As expected, Hess opined that the guns shown in the photographs had features consistent with a Glock and a Ruger. On cross-examination, Alvarez's counsel questioned how Hess could be sure that one of the guns shown in the photograph (the Ruger) was "an actual real gun that fires bullets." Hess allowed that, "It could be a real firearm and it could be a movie prop firearm or some other firearm that shoots blank caps." Later, Alvarez's counsel asked whether the gun in the photograph could be an airsoft gun, which resembles a real firearm, but uses compressed air to shoot small plastic pellets, rather than bullets. Hess reiterated that the gun in the photograph had "characteristics that were consistent with a Ruger pistol," but allowed that "it may not be an actual firearm." Later still, Alvarez's counsel asked whether Hess had considered the possibility that photographs of Alvarez might have been altered. Hess responded that he was not asked to examine the photographs for signs of having been altered but allowed that digital photographs can be easily altered with Photoshop and other editing programs.

The trial court conducted another hearing on the admissibility of the Glock after Hess completed his testimony. The trial court began by describing an earlier off the record proceeding in which the parties discussed a stipulation stating that Alvarez was a member of Narf at the time of the offense. The trial court explained that the court had expressed concern that the stipulation did not address the admissibility of the Glock. The trial court went on to say that the prosecutor wanted to present evidence of the Glock to show that the guns in the photograph were real firearms, rather than replicas or facsimiles, and the court was inclined to admit the Glock for this purpose. Alvarez's counsel objected. The trial court overruled the objections and deemed the Glock admissible.

Towards the end of the trial, the prosecutor and Alvarez stipulated that Alvarez was a member of Narf on "March 11th and 12th, 2011." The prosecutor and Alvarez also stipulated to the circumstances surrounding the execution of the search warrant at Bost's apartment. With respect to the Glock, the stipulation provides:

"After the scene was secured, detectives located a loaded black Glock .40-caliber handgun with an extended magazine over the fence where Deputy Baker observed Mr. Alvarez throw it. This gun, as well as the extended magazine and bullets, are marked as People's Exhibits 88, which includes 88-A and -B, through Exhibit—People's Exhibit 91 ...."

"These items that have been described—that is, the gun, the bullets, the magazine, and so forth—are depicted in the photographs identified as People's 36 through 43."

The parties further stipulated that the Glock seized during the

execution of the search warrant at Bost's apartment did not eject any of the cartridge casings found at the scene of the shooting. Following the reading of the stipulations, the prosecutor published the photographs and the Glock to the jury.

During closing argument, Alvarez's counsel urged the jury to disregard the photographs, stating that, at most, they tend to show "my client is a person who makes poor choices, either because he actually had guns or because he's stupid enough to Photoshop it or take pictures with fake guns."

### 2. Analysis

Alvarez argues the trial court erred in admitting the Glock. Specifically, Alvarez argues that the Glock "shows nothing but bad character," and was more prejudicial than probative. Alvarez also argues that the Glock was so inflammatory as to deny him his due process right to a fair trial. We are not persuaded.

Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [trial court erred in admitting evidence of defendant's prior possession of handgun similar to murder weapon where prosecutor did not claim such weapon was actually used in murders]; see also *People v. Riser* (1956) 47 Cal.2d 566, 577 [trial court erred in admitting evidence of a Colt .38-caliber revolver found in defendant's possession two weeks after murders where evidence showed weapon actually used was a Smith and Wesson .38-caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [trial court erred in admitting evidence of knives recovered from defendant's residence two years after murder where knives were not murder weapon and were irrelevant to show planning or availability of weapons].) In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons —a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant. [Citations.]" (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

However, evidence of weapons not actually used in the commission of a crime may be admissible when they are relevant for other purposes. (*People v. Cox, supra,* 30 Cal.4th at p. 956 [when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible].) The critical inquiry is whether the weapons evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence. (*People v. Barnwell, supra,* 41 Cal.4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

Here, the prosecution introduced photographs showing Alexander holding two guns on the night of the shooting. One of the guns, a Ruger, was believed to have been used in the shooting. The other gun, a Glock, was seized during the execution of the search warrant on Bost's apartment. The prosecutor offered several theories of relevance for the Glock during the course of the trial, many of which were obviated by the stipulation that Alvarez was a member of Narf. However, the gun was ultimately admitted to rebut the defense theory that the guns shown in the photographs were not real, a theory Alvarez's counsel continued to advance in closing argument. The trial court could reasonably conclude that the Glock (which was real), had a tendency in reason to show that the Ruger (which was never found), was also real. (Evid. Code, § 210.) We perceive no abuse of discretion in the trial court's decision to admit the Glock.

But even assuming arguendo that the trial court erred, the error was harmless. Even without the Glock, the jury would have seen the photographs of Alvarez holding two guns, one of which was believed to have been the murder weapon. Alvarez does not challenge the admission of the photographs, which were arguably more inflammatory than the Glock. Under the circumstances, we see no reasonable probability that Alvarez would have achieved a more favorable result had the Glock been excluded. Nor can we say that admission of the Glock rendered the trial fundamentally unfair, resulting in a denial of due process. The admission of the Glock was no more inflammatory than the other gun evidence before the jury, including the photographs, and the properly admitted evidence against Alvarez was overwhelming, as we have already shown. We therefore conclude that the admission of the Glock was harmless, even assuming error.

(ECF No. 10-18 at 21–24.)

**H. Discussion**

As explained above, the admission of evidence violates due process only if the jury could draw no permissible inferences from the evidence. Jammal, 926 F.2d at 920. The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101. "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions." Jammal, 926 F.2d at 920.

This Court concludes that it was not objectively unreasonable for the state court to decide that the trial court did not abuse its discretion in the admitting the gun "to rebut the defense theory that the guns shown in the photographs were not real, a theory Alvarez's counsel continued to

advance in closing argument." (ECF No. 10-18 at 24.) As the state court noted, "[t]he trial court could reasonably conclude that the Glock (which was real), had a tendency in reason to show that the Ruger (which was never found), was also real." (ECF No. 10-18 at 24.) That is a rational and permissible inference the jury could draw from the Glock firearm. See, e.g., Nijmeddin v. Lizarraga, No. 18-cv-05588-BLF, 2021 WL 3810256, at *20–22 (N.D. Cal. Aug. 26, 2021); Estrada v. McDowell, No. 16-cv-02827-YGR (PR), 2017 WL 5068641, at *16–20, 26–28 (N.D. Cal. Nov. 3, 2017); Trujillo v. Lewis, No. 11-CV-0522 YGR, 2014 WL 4832216, at *16 (N.D. Cal. Sept. 26, 2014); Franco v. Long, No. CV 11-4368-DMG (DTB), 2014 WL 117322, at *15 (C.D. Cal. Jan. 6, 2014). The trial court also generally instructed the jury that when "certain evidence was admitted for a limited purpose," the jury may "consider that evidence only for that purpose and for no other." (ECF No. 9-9 at 179; see also id. at 193 (instruction on limited purpose of evidence of gang activity.))

Even if the trial court erred in admitting the gun, habeas relief is only warranted if petitioner can establish that the error had substantial and injurious effect or influence on the jury's verdict. Brecht, 507 U.S. at 637. Here, petitioner has not made that showing. The trial record includes an unobjected photograph of co-defendant Alvarez holding two guns, one of which is the Glock and the other is believed to have been the murder weapon. (ECF No. 10-18 at 24; see also ECF No. 9-9 at 44.) Because the jury learned about the Glock gun from the photograph, the admission of the Glock gun into evidence could not have had a substantial and injurious impact on the verdict. This Court recommends denying habeas relief on this claim.

## VII.    Claim Seven: Cumulative Errors

Lastly, petitioner claims the cumulative effect of multiple constitutional errors denied him his Fourteenth Amendment right to due process. (ECF No. 1 at 73–74.) Respondent asserts that "given the reasonable finding of no constitutional error, it was necessarily reasonable to find no prejudice cumulating from multiple constitutional errors." (ECF No. 11 at 13.)

### I.    State Court Opinion

On direct appeal, the state court evaluated and rejected petitioner's cumulative error claim.

1

2

3

4

5

> Defendants contend that cumulative error requires reversal. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) Here, we have found only one error by the trial court, which we have deemed harmless. Therefore, there is no error to cumulate.

6

7

8

(ECF No. 10-18 at 36.)  The "one error" was regarding whether the trial court should exercise its discretion under section 1385 to strike the firearm enhancement under section 12022.53(h), an issue not raised in this habeas petition.

9       **J.  Discussion**

10

11

12

13

14

15

16

17

18

19

The Ninth Circuit has concluded that under clearly established Supreme Court precedent "the combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair" and "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly, 416 U.S. at 643 and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." Id. at 928 (internal citations omitted).

20

21

22

23

24

This Court has addressed each of petitioner's claimed errors, concluding that none of them arise to errors of constitutional magnitude. It now determines that the alleged errors did not make petitioner's defense "far less persuasive" or have a "substantial and injurious effect or influence on the jury's verdict." As a result, this Court recommends denying petitioner's request for habeas relief on his cumulative error claim.

25                              **CONCLUSION**

26

27

28

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable

1   determination of the facts.

2   THEREFORE, it is RECOMMENDED that petitioner's petition for a writ of habeas

3   corpus (ECF No. 1) be denied.

4   These findings and recommendations will be submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days

6   after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties. The document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

9   shall be served on all parties and filed with the court within seven (7) days after service of the

10   objections. Failure to file objections within the specified time may waive the right to appeal the

11   District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951

12   F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of

13   appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11,

14   Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability

15   when it enters a final order adverse to the applicant).

16   Dated:  June 13, 2023

17

18

19   DLB7;
     PATH

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28